UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STACY SCOTT-MCKINNEY, M.D.**,<br><br>Plaintiff,<br><br>v.<br><br>**CHILDREN'S NATIONAL MEDICAL CENTER/CHILDREN'S NATIONAL HEALTH SYSTEM**,<br><br>Defendant. | Case No. 1:19-cv-02980 (TNM) |

### MEMORANDUM OPINION

Dr. Stacy Scott-McKinney sued Children's National Medical Center (Children's National, or the Hospital) under the D.C. Human Rights Act. She alleged the Hospital discriminated against her because of her disability when it denied her a scribe to assist in her work as a physician. A jury agreed and awarded $200,000 in non-economic damages. Scott-McKinney now seeks more remedies—injunctive relief, back pay, and front pay—and the Hospital objects. The Court held an evidentiary hearing and received post-hearing briefing on remedies. Considering the evidence adduced at trial and the post-trial damages hearing, as well as the parties' briefing, the Court finds Scott-McKinney is entitled to some prospective injunctive relief but has not proven economic damages.

### I. FACTUAL BACKGROUND AND LEGAL PRINCIPLES

As early as 2017, Scott-McKinney had pain and other symptoms in her neck, shoulder, and hand. Both parties agree Scott-McKinney's physical ailments make her "disabled" under federal and D.C. law. Her work as a physician in the Hospital's Laurel, Maryland, practice—in

particular, typing and clicking during medical notetaking—exacerbated that disability. The Hospital provided Scott-McKinney a scribe to assist in those notetaking responsibilities to ameliorate her pain. Then, from July 2019 to November 2020, the Hospital removed the scribe.

Scott-McKinney sued. She argued the Hospital's failure to provide a scribe violated the District's anti-discrimination law (the D.C. Human Rights Act or DCHRA). A jury agreed, awarding $200,000 in non-economic damages. The only remaining question is whether the Court should also award back pay, front pay, and/or injunctive relief.

The DCHRA allows a plaintiff to recover "damages and such other remedies as may be appropriate." D.C. Code § 2-1403.16(a). Those remedies may include an "order . . . requiring such respondent to cease and desist from such unlawful discriminatory practice" as well as "compensatory damages to the person aggrieved by such practice." *Id.* § 2-1403.13(a)(1), (a)(1)(D); *see also id.* § 2-1403.16(b). A court may make factual findings to determine what relief is appropriate, but those findings and the relief it awards must be "consistent with the jury verdict." *Porter v. Natsios*, 414 F.3d 13, 21 (D.C. Cir. 2005). Ultimately, the plaintiff bears the burden of "proving damages with reasonable certainty." *Robinson v. District of Columbia*, 341 F. Supp. 3d 97, 109 (D.D.C. 2018) (cleaned up); *see also* D.C. Mun. Regs. tit. 4 § 200.3 (noting an intent to "award damages of any nature whatever which can be fairly proved to have resulted from acts of discrimination").

Ultimately, Scott-McKinney does not show she suffered—or will suffer—economic damages because of Children's National failing to provide a scribe. She *has* shown a reasonable likelihood Children's National may discriminate against her again by removing her scribe, entitling her to an injunction prohibiting the Hospital from doing so. There is no evidence, however, showing a need for broader, company-wide relief.

The Court explains its conclusion for each form of relief below, but certain credibility findings are relevant to all forms of relief and thus warrant preliminary discussion. At the evidentiary hearing, Scott-McKinney testified about her symptoms, their effect on her work, and her alleged lost wages due to losing her scribe. She also proffered several demonstrative exhibits, videotaped deposition testimony from Dr. David Levin (one of her treating physicians) introduced at trial, and doctor's notes documenting her disability diagnosis and prognosis. Children's National relied mostly on Levin's videotaped deposition testimony, live testimony at the evidentiary hearing from its Director of Business Operations, Mark Janowiak, and cross-examination of Plaintiff's witnesses. Reviewing this evidence, the Court makes the following initial findings of fact:

- Scott-McKinney is a generally credible witness. Her demeanor throughout the evidentiary hearing was calm and precise, suggesting honesty. Substantively, Scott-McKinney gave compelling testimony showing that her disability has limited her ability to manage a typical patient load.

- Janowiak is a highly credible witness with background knowledge that makes him uniquely qualified to testify about physician compensation at Children's National. Because Janowiak calculates physician pay at the Laurel Practice, he is well-positioned to opine on whether (and how much) Scott-McKinney lost out on compensation during the time she worked without a scribe. He came across as very intelligent and competent in his field.

- When Scott-McKinney and Janowiak's back/front pay calculations conflict, the Court finds Janowiak's testimony more credible. Although the Court found Scott-McKinney to be generally credible, her testimony on this point is self-serving—she has every incentive to inflate her past and potential lost wages to increase her pay—and well outside her area of expertise. More, her lost-pay calculations appear to be adopted from a now-abandoned expert report, and cross-examination during the evidentiary hearing showed those calculations do not reflect how the Hospital compensates physicians. By contrast, Janowiak's testimony was well-supported by actuarial explanation.

- Doctor's notes recording Plaintiff's diagnosis and treatment are probative but ultimately entitled to little weight. The Court found adequate foundation authenticating those notes, but they do not (on their face) establish causation between Scott-McKinney's disability and the Hospital removing her scribe. Without supporting testimony to provide that causal link, they are of little probative value.

With these general findings of fact in mind, the Court turns to its more particularized findings for each form of relief.

## II. BACK PAY

Scott-McKinney is not entitled to back pay because the evidence shows the Hospital's discrimination did not impact her pay in Fiscal Year 2020 or Fiscal Year 2021.

To understand why requires some understanding of how Children's National compensates physicians. The Hospital's physician pay consists of base compensation and incentive compensation. *See, e.g.*, Pl.'s Ex. 119 (FY 2020 Annual Physician Compensation Reconciliation Report). Janowiak, explained how those two forms of pay break down. Children's National calculates what it calls "actual earned compensation" by multiplying a physician's net medical revenue by an inverse expense ratio (total expenses/total charges). *See* May 2, 2022, Remedies Hearing Tr. (RH Tr.) 133:15–134:11 (Testimony of M. Janowiak). A physician's base compensation is 85% of the rolling three-year average of that actual earned compensation figure. *See id.* at 134:10–11. If a physician's annual actual earned compensation exceeds her base compensation, she can receive that excess as incentive pay. *See id.* at 132:16–17. But, if a practice runs a budget deficit, actual earned compensation is reduced on a *pro rata* basis so that all physicians bear their share of the shortfall. *See id.* at 135:8–14.[1]

---

[1] "Senior" physicians may also earn a "junior doctor credit"—essentially a percentage of revenue generated by less-experienced doctors in the practice. *See, e.g.*, Pl.'s Ex. 192 (FY 2021 Annual Physician Comp. Reconciliation Rep't).

Applying this compensation formula, Scott-McKinney did not lose any pay in FY 2020 due to the Hospital's discrimination.[2] The Laurel Practice ran a significant budget margin deficit—$54,381—because of business shutdowns occasioned by COVID-19, which in turn meant none of the practice's physicians were eligible for incentive pay in Q3 or Q4. *See* Pl.'s Ex. 194; Pl.'s Ex. 119; RH Tr. 140:16–17 ("When it first hit, they essentially stopped visits. All visits stopped."); *id.* at 143:4–11. Scott-McKinney concedes the Hospital's failure to provide a scribe did not cause her any back-pay losses in FY2020. *See* RH Tr. 47:4–5.

The real dispute concerns whether Plaintiff lost incentive pay in FY 2021. She testified that working without a scribe made her documentation responsibilities significantly more onerous. *See, e.g.*, RH Tr. 28:17–19 ("I had a very difficult time managing really long hours. I brought work home routinely, worked into the middle of the night routinely."). And her symptoms apparently worsened and took on new dimensions during that time. *See, e.g.*, *id.* at 28:22–24 ("I had worsening neck and shoulder pain, and I also had quite significant hand symptoms, cold, achy, numb, blue hand.").

But Scott-McKinney has not shown her loss of efficiency caused her to lose out on incentive pay. To the contrary, the evidence shows that even with a scribe Plaintiff likely would have been paid the same. This was evident in Janowiak's testimony. He presented a hypothetical compensation calculation for FY 2021, replacing the two FY 2021 quarters Scott-McKinney operated *without* a scribe with figures representing her best financial quarter *with* a

---

[2] There was some confusion at the evidentiary hearing about whether Scott-McKinney claims losses in base salary, losses in incentive payout, or some combination of both. *See* RH Tr. 108:19–112:3. But Plaintiff ultimately acknowledged "loss in base salary[ ] is not calculated" in her back-pay loss calculations. *Id.* at 112:11–13. And, if there were any doubt, her own exhibits calculate back-pay losses as a "Year-End Incentive Payout." *See, e.g.*, Pl.'s Ex. 195 (line 36).

5

virtual scribe.[3]  *See* Def.'s Ex. 192A (Hypothetical FY 2021 Annual Physician Comp. Reconciliation Rep't); RH Tr. 148:13–16.  Even with that Plaintiff-friendly calculation, Scott-McKinney's actual earned compensation (after budget margin) would not exceed her base compensation.  *See id.* at 150:2; *see also* Def.'s Ex. 192A (actual earned compensation: $233,270; base compensation: $236,820; incentive payout: $0).  This is because of FY 2021's particularly high budget margin deficit.  *Compare* Pl.'s Ex. 110 (FY 2018 Annual Physician Comp. Reconciliation Rep't) (showing a budget margin deficit of $30,039), *with* Pl.'s Ex. 195 (FY 2021 Reconciliation Rep't) (showing a budget margin deficit of $154,028).[4]  So there is a straightforward, nondiscriminatory explanation for Plaintiff not receiving incentive pay.

Seeking to avoid this conclusion, Scott-McKinney offers an alternative calculation.  In her post-evidentiary hearing briefing, she summarizes her methodology as follows:

- She reviewed the "Summary by Provider" documents (Pl.'s Exs. 97 & 193) to determine her annual patient visits and annual revenues that she generated for fiscal years 2018 through 2021.

- She then took all her patient visits by fiscal year for FY 2018 and 2019 and compared those numbers to those of FY 2020 and 2021 to determine the average lost patient visits of 763. See Pl. Ex. 196 at 2. This corroborated her assumption of losing about 15 patient visits per week, or 735 patient visits per year (15 patient visits x 49 weeks, which reflects vacations) based on a reduced direct patient care schedule of six hours versus eight.

---

[3] Although these figures are hypothetical, the Court has already explained that Janowiak is "a witness who is well-positioned to make the assumption[s]" underlying them.  RH Tr. 148:6–7.  Scott-McKinney says the hypotheticals are faulty because they rely on her performance under a 6-hour work-restriction with a virtual scribe post-November 2020, rather than her performance in the 13 years before losing her scribe.  *See* Pl.'s Br. on Remedies 13 n.12.  Plaintiff did not meaningfully impeach Janowiak on this point at the evidentiary hearing.  And in any case, it makes little sense to rely on Scott-McKinney's performance in the years before her disability deteriorated.  The question is how much revenue she could have generated in FY 2021 while coping with limiting symptoms, not how much revenue she could generate before her symptoms became apparent.

[4] Plaintiff acknowledged the uniquely high budget margin deficit in FY 2021.  *See* Pl.'s Br. on Remedies 14 ("FY 2021 was plagued by COVID-related expenses . . . .").

- She then determined that her average revenue per patient visit for FY 2020 was $192.50 by dividing her total revenue for that fiscal year by her total patient visits for the year.
- She performed the same calculation for FY 2021 to arrive at an average revenue per patient visit of $220.00.
- She then used Defendant's Annual Physician Compensation Reconciliation Reports for fiscal years 2020 and 2021 (Pl. Exs. 119 and 192), applied the formulas contained there, which came directly from her Employment Agreement's Physician Compensation Plan (Pl. Ex. 1, App'x C), and performed the calculations to determine her back pay loss.

Pl.'s Br. on Remedies 12, ECF No. 103.

The Court finds this methodology is unreliable. Scott-McKinney's calculations largely rely on multiplying purported lost revenue (due to working less without a scribe) by a "conservative" baseline of how much of the practice's revenue Plaintiff generates (32%). *See* Pl.'s Ex. 196. But there's at least two problems with that approach.

*First*, as Scott-McKinney admits, Children's National does not determine her compensation that way. *See* RH Tr. 112:21 –113:3 ("Q: Does your employment agreement provide that you will be paid a percentage of your patient revenue as wages? . . . A: I don't think so but I would have to read it again."); *see also* Pl.'s Ex. 1 (Employment Agreement). *Second*, and more fundamentally, her "lost revenue" calculation appears to attribute 100% of the reduction in patient visits to the Hospital's discrimination—it does not reflect other reasons she may have seen a reduced patient load in FY 2021 compared with FY 2019. For example, nowhere does the "reduced patient visits" calculation account for Plaintiff's 3-week vacation or her 8-week sabbatical for COVID-19.[5] *See* RH Tr. 46:14–19. Nor does it consider that the practice shut down its second location. *See id.* at 130:18–24 ("They are now in one location,

---

[5] This omission is particularly strange because Scott-McKinney *does* account for her vacation and sabbatical in calculating the total number of weeks she worked.

7

with six exam rooms [as opposed to 16], and the same number of providers. So it's physically impossible to see that same volume of patients that they were seeing in '18 and/or '19 with only one location."). And it does not acknowledge that one of Scott-McKinney's baseline years—FY 2019—was "an abnormally good year." *Id.* at 131:9–10.

Given all this, the Court has serious doubts about the reliability of Plaintiff's back-pay calculations. She selected a methodology that differs significantly from how Children's National calculates her compensation. In doing so, she ignored contributing factors that might reduce her overall back pay recovery while relying on baselines that are uniquely favorable to her. By contrast, Janowiak gave detailed, well-supported testimony explaining (1) how physicians at Children's National are compensated, (2) why physicians in the Laurel practice saw reduced patient loads in FY 2021, and (3) why even Plaintiff's best quarter with a virtual scribe would not have earned her any more compensation in FY 2021 due to an unusually high budget margin deficit. And Scott-McKinney never successfully impeached Janowiak on the accuracy of these points.

Given all this, the Court finds Plaintiff has not proved back-pay damages to a "reasonable certainty." *Robinson*, 341 F. Supp. 3d at 109 (cleaned up).[6]

### III. PAY AFTER NOVEMBER 2020/FRONT PAY

The next question is whether Plaintiff is entitled to compensation for *ongoing* harm caused by the Hospital's failure to provide a scribe for 16 months. The Court finds Scott-

---

[6] By extension, Scott-McKinney has no right to lost employer contributions on her purported back-pay losses. The Court therefore denies that requested relief as well.

McKinney has not shown the Hospital's discrimination caused lasting harm that will undermine her ability to earn compensation when working with a scribe.

Plaintiff's argument in favor of front pay is straightforward, relying on two premises. First, she says "excessive typing" without a scribe from July 2019 to November 2020 caused her repetitive strain injuries. Pl.'s Br. on Remedies 5. Second, those repetitive strain injuries form "the catalytic factor that prevents Dr. Scott-McKinney from resuming 8 hours of direct patient care." *Id.* 6–7. As a result, she argues, she is entitled to front pay to compensate her for the added revenue she would have generated but-for the Hospital's discrimination. *Id.* 18; *see also* Pl.'s Ex. 196 at 2 (Front Pay Calculation).

Scott-McKinney offers a variety of evidence to establish premise one—that working without a scribe caused her repetitive strain injuries.

At the evidentiary hearing on damages, Plaintiff testified that during the 16 months without a scribe she "had a very difficult time managing really long hours" and that she "had quite significant hand symptoms, cold, achy, numb, blue hand." RH Tr. 28:11–19; *id.* 28:20–24. Scott-McKinney eventually sought care from Dr. Leo Rozmaryn, *see* Pl.'s Ex. 197 (Treatment Notes from Dr. Rozmaryn), who diagnosed her with repetitive strain syndrome secondary to carpal tunnel syndrome, *id.* (February 4, 2021 note). She says Rozmaryn concluded "the hand injury is related to the work" and that "the physical stressors of her job are a significant contributing factor." *See id.* She also relies on videotaped deposition testimony—introduced at trial—from Levin, the physician who treated her cervical-spine disability. He explained that Plaintiff "suffers from a hand disorder that is different and independent from the radiculopathy associated with her neck and shoulder disorders." Pl.'s Br. on Remedies 8 (citing Levin Dep. 15:6–16:17, ECF No. 103-2).

But these diagnoses do not facially support a causal link between the Hospital removing Scott-McKinney's scribe and her developing carpal tunnel syndrome. Rozmaryn's references to "the work" and "the physical stressors of her job" suggest Plaintiff's work *in general* causes her symptoms, not that the specific 16-month period at issue is responsible. The evidence confirms as much.

The record shows Scott-McKinney's non-radiculopathic symptoms predate the Hospital's discrimination by more than a year. Rozmaryn's initial patient visit notes reveal Plaintiff "*for the past 3 years* has had steady increasing pain mostly numbness and tingling and color changes in her fingers." Def.'s Ex. 173 (Dr. Rozmaryn 8/11/2020 Patient Notes) (emphasis added); *see also* Pl.'s 197 (Dr. Rozmaryn 2/2/2021 Patient Notes) (showing Plaintiff's pain "has been present for 4 years"). And Dr. Sunjay Berdia—another treating physician—noted that Plaintiff's "discoloration and color changes and numbness" had "been going on for about one year" in *March 2019*. *See* Pl.'s Ex. 200. That these symptoms arose well before the Hospital removed her scribe undermines any causal connection between the two.

To overcome this problematic timeline, Scott-McKinney says Berdia "ruled out carpel [sic] tunnel syndrome as a diagnosis for the hand symptoms that [she] was experiencing" during her March 2019 exam. Pl.'s Br. on Remedies 5. True, Berdia offered a preliminary opinion that her non-radiculopathic symptoms were "more vascular in nature, . . . not coming from her cervical or carpal tunnel." Pl.'s Ex. 200; *see id.* (noting an impression of "[r]ight hand Reynaud's phenomenon"). But Rozmaryn later noted that diagnosis was incomplete after more testing. *See* Def.'s Ex. 173 (Dr. Rozmaryn 8/11/2020 Patient Notes) ("She has . . . had vascular studies which were really not that conclusive except she was told that she has some Reynaud's disease with color changes when she put her finders in cold water. With the vascular flow study

she has had arteriograms with Doppler. And essentially was told that this was mostly normal."). In any case, this argument proves too much—Rozmaryn himself ruled out carpal tunnel syndrome in August 2020, more than a year after the Hospital removed Plaintiff's scribe. *See id.* ("She has no history of any night pain, which rules out carpal tunnel syndrome.").

To be sure, Scott-McKinney's symptoms worsened over time. But that deterioration, again, does not establish a causal link between the Hospital removing her scribe and her non-radiculopathic symptoms. Rozmaryn's own notes explain that "[i]n most people, [carpal tunnel] symptoms worsen over time." *See* Pl.'s Ex. 197 (Dr. Rozmaryn 2/2/2021 Patient Notes). And "many factors [ ] contribute to [that] development"—"heredity, being overweight, overuse of the hand (i.e., extensive typing), hormone changes during pregnancy, and age." *Id.* So, without more, Plaintiff has shown only a temporal *correlation* between losing her scribe and a deterioration in her condition; she has not shown *causation*.

Part of the issue here is that Scott-McKinney relies almost entirely upon enigmatic doctor's notes to prove causation. Although the Court admitted these notes over the Hospital's objections, they ultimately do not provide the proof that she needs. Indeed, as explained above, the timeline they imply defeats her case. The only actual testimony from an expert, Dr. Levin, was at best irrelevant and at worst undermined her argument.[7] This leaves her with her own

---

[7] Levin acknowledged Plaintiff is "not able to tolerate the amount of time that she was working prior" to losing her scribe, but he could not say with "medical certainty that her conditions worsened as a result of not having that scribe." Levin Dep. 72:19–73:9. Scott-McKinney says that testimony was limited to her cervical-spine issues. Perhaps. But reading Levin's testimony as limited in scope still leaves Plaintiff with a dearth of causation evidence related to her non-radiculopathic symptoms.

11

testimony. It was sincere, but she is neither an expert in this area nor did her explanations alone fill the holes in the other evidence.

In sum, the evidence shows Scott-McKinney's repetitive strain injury predates the Hospital's decision to remove her scribe and arises out of her work. While her condition appears to have worsened during the 16 months at issue, there is no medical evidence establishing a causal link between that deterioration and her working without a scribe. So there is little basis to link the Hospital's decision to remove the scribe with her diminished earning capacity. That means there is no basis to award front pay.[8]

## IV. INJUNCTIVE RELIEF

The last question is whether Plaintiff is entitled to injunctive relief. She asks for two types of injunctions: (1) an order requiring the Hospital "to provide a scribe" until a valid substitute can be found, and (2) an order requiring the Hospital "to train its managers annually" on the DCHRA's requirements and "to post statutorily required notices of such laws." Pl.'s Br. on Remedies 26–27.

"Given the substantial similarity" between Title VII and the DCHRA, courts in this circuit rely on interpretations of Title VII when reviewing claims under the DCHRA. *See Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999); *cf. Estenos v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 886 (D.C. 2008). In the mine run of Title VII cases, "enjoining a defendant from further acts of discrimination is a typical remedy." *Johnson*

---

[8] Given this, the Court need not reach Plaintiff's second premise—that her repetitive strain injury is "the catalytic factor that prevents Dr. Scott-McKinney from resuming 8 hours of direct patient care." Pl.'s Br. on Remedies 6–7. And the Court likewise need not address any claim for lost employer contributions to front pay.

*v. Brock*, 810 F.2d 219, 225 (D.C. Cir. 1987). This is true even where the defendant ceases the illegal conduct. And a "request for injunctive relief will be moot only where there is no reasonable expectation that the conduct will recur." *Bundy v. Jackson*, 641 F.2d 934, 946 n.13 (D.C. Cir. 1981).[9] But any such injunctive relief "should be narrowly tailored and should generally apply only to the plaintiff where a class has not been certified." *Jean-Baptiste v. District of Columbia*, 958 F. Supp. 2d 37, 50 (D.D.C. 2013).

The Hospital has not shown that "there is no reasonable expectation that the conduct will recur." *Bundy*, 641 F.2d at 946 n.13. To dispel the prospect of future discrimination, it offers Janowiak's testimony that it has "budgeted [Scott-McKinney's scribe] for the next fiscal year." RH Tr. 158:6–7. But that is not enough—although it appears the Hospital intends to employ a scribe for FY 2023, the Court can only speculate about its plans afterward. And as Plaintiff notes, it appears the Hospital intends to implement a new electronic medical records (EMR) technology in late-2022, potentially paired with a pre-existing voice dictation software (VDS). *See* Decl. of Dr. Scott-McKinney ¶¶ 3, 9 ECF No. 96-1. Children's National had implemented VDS as an "alternative" during the 16 months it removed her scribe, *see id.* ¶ 5, so Plaintiff's concern that this technological changeover may lead to further discrimination is not unreasonable.[10]

---

[9] As other courts have recognized, a different four-factor test applies to most requests for permanent injunction. *See Jean Baptiste v. District of Columbia*, 958 F. Supp. 2d 37, 49 n.15 (D.D.C. 2013) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). But it appears "the general practice in our Circuit [is] granting Title VII injunctions without an explicit invocation of this test." *Id.* Neither party has suggested otherwise. The Court thus follows suit.

[10] In a late filing, Plaintiff offered invoices showing the Hospital was late in paying for her scribe at least once. *See* Pl.'s Ex. to Praecipe, ECF No. 106-1; Def.'s Response to Praecipe, ECF No. 107. The Court acknowledges this additional evidence but finds it does little to establish a prospect of future discrimination.

The Hospital says issuing an injunction requiring it to provide a scribe would be a windfall because "under the DCHRA, no employee enjoys the unfettered right to a single accommodation through their anticipated retirement." Def.'s Post-Trial Br. 14, ECF No. 93. It says there are an "endless number of ways in which Plaintiff's computing responsibilities, physical limitations, and potential accommodations could change." *Id.* 15. Sure, those things might change. But Defendant has offered nothing to show they *will* change, much less any concrete details about how those changes would affect the reasonableness of using a scribe as an accommodation.

The jury reviewed ample evidence of Scott-McKinney's limitations, her work responsibilities, and the Hospital's "alternatives" to a scribe. It concluded a scribe was a reasonable accommodation and that the Hospital's failure to provide one was unlawful. The Court will not contradict that finding. *See Porter*, 414 F.3d at 21 (noting that a court's remedy must be "consistent with the jury verdict"). A scribe is a reasonable accommodation, and the Court will order that Defendant provides one for Scott-McKinney as long as she works at Children's National.

The Court will not, however, order broad company-wide injunctive relief. Scott-McKinney requests an order requiring the Hospital to "train its managers annually on disability discrimination law requirements, reasonable accommodation, and the interactive process," as well as "to post statutorily required notices of such laws." Pl.'s Br. on Remedies 26–27. But Plaintiff did not seek to certify a class and there was no evidence establishing systemic unlawful behavior toward individuals with disabilities. She offers only bare *ipsi dixit*. *See id.* at 27 ("To date, Defendant has not done so."). Without more, the Court will not order such sweeping relief.

14

## V. CONCLUSION

In sum, Scott-McKinney has not established the Hospital's discrimination caused her to lose out on incentive pay in fiscal years 2020 and 2021. She has also not shown the Hospital's discrimination reduced her earning capacity going forward. That means she is not entitled to back or front pay. But Plaintiff has established a reasonable probability of discrimination going forward, and the Hospital has offered almost no evidence to dispel the specter of future discrimination. For that reason Scott-McKinney is entitled to an injunction requiring the Hospital to provide her a scribe.

A separate order will issue.

Dated: July 5, 2022                                         TREVOR N. McFADDEN, U.S.D.J.